No. 17-2444

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

ASHLEY AMARIS OVERBEY; BALTIMORE BREW,

*Plaintiffs-Appellants*,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE; BALTIMORE CITY
POLICE DEPARTMENT,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the District of Maryland, at Baltimore,
The Honorable Marvin J. Garbis, Senior U.S. District Judge

---

## OPENING BRIEF FOR APPELLANTS
## ASHLEY AMARIS OVERBEY AND BALTIMORE BREW

---

Deborah Jeon
Nicholas Steiner
American Civil Liberties Union of
  Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211

Daniel W. Wolff
Charles D. Austin
Nkechi Kanu
Tyler O'Connor
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
dwolff@crowell.com
Telephone: (202) 624-2500
Fax: (202) 628-5116

*Counsel for Appellants Ashley
Amaris Overbey; Baltimore Brew*

Dated: May 21, 2018

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __17-2444__    Caption: __Ashley Overbey v. Mayor and City Council of Baltimore__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ashley Amaris Overbey__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Daniel W. Wolff       Date: 05/21/2018

Counsel for: Ashley Amaris Overbey

## CERTIFICATE OF SERVICE
**************************

I certify that on 05/21/2018 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Daniel W. Wolff       05/21/2018
   (signature)                  (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. <u>17-2444</u>     Caption: <u>Ashley Overbey v. Mayor and City Council of Baltimore</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Baltimore Brew</u>
(name of party/amicus)

who is <u>appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Daniel W. Wolff          Date:          05/21/2018

Counsel for: Baltimore Brew

## CERTIFICATE OF SERVICE
**************************

I certify that on          05/21/2018          the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Daniel W. Wolff          05/21/2018
          (signature)                                        (date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES............................................................ 1

STATEMENT OF THE CASE .............................................................. 3

I.     FACTUAL BACKGROUND........................................................ 4

    A.    Ashley Overbey ................................................................ 4

    B.    Baltimore Brew ............................................................. 11

    C.    The Department of Justice Report on Baltimore
         Policing ......................................................................... 13

II.    PROCEDURAL POSTURE......................................................... 14

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ..................................................................................... 21

I.     THE CITY OF BALTIMORE'S NON-
      DISPARAGEMENT POLICY VIOLATES THE FIRST
      AMENDMENT. ..................................................................... 21

    A.    Standard of Review ....................................................... 25

    B.    Baltimore's Non-Disparagement Policy Is Facially
         Unconstitutional. .......................................................... 26

    C.    If Not Facially Unconstitutional, Baltimore's
         Non-Disparagement Policy Is Unconstitutional as
         Applied.......................................................................... 32

         1.    Ms. Overbey Neither Knowingly Nor
             Voluntarily Waived Her First Amendment
             Rights. .................................................................. 35

             a.    Ms. Overbey Did Not Understand the
                 Waiver to Prevent the Actions She
                 Took.......................................................... 36

             b.    The Non-Disparagement Clause Was a
                 Product of Unequal Bargaining Power............. 39

         2.    The Non-Disparagement Clause Does Not
             Further A Legitimate Government Interest

          That Outweighs Public Interest In Free
          Speech On Matters Of Public Importance.................44

    D.    The District Court Erred by Dismissing This
          Case Before the Parties had the Opportunity to
          Conduct Discovery.............................................................53

II.   THE DISTRICT COURT ERRED IN HOLDING THAT
     THE BALTIMORE BREW DOES NOT HAVE
     STANDING TO CHALLENGE THE GAG ORDER....................54

    A.    Standard of Review ...........................................................54

    B.    As A Media Outlet, the Baltimore Brew Has
          Standing to Challenge the City's Actions Stifling
          the Flow of Newsworthy Information. ..............................55

        1.    The Brew Suffered Redressible Injury-In-
             Fact From the City's Policy of Restricting
             Access to Information.................................................57

        2.    The District Court Erred In Finding No
             First Amendment Implications..................................60

CONCLUSION .....................................................................................62

ORAL ARGUMENT STATEMENT .......................................................63

CERTIFICATE OF COMPLIANCE.........................................................64

CERTIFICATE OF SERVICE.................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Leasing & Fin., Inc. v. IPM Tech., Inc.,*
 885 F.2d 188 (4th Cir. 1989) ............................................................ 37

*Berghuis v. Thompkins,*
 560 U.S. 370 (2010) .......................................................................... 40

*Bridges v. California,*
 314 U.S. 252 (1941) .................................................................... 23, 32

*CBS v. Young,*
 522 F.2d 234 (6th Cir. 1975) ....................................................... 57, 61

*Cent. S.C. Chapter, Soc. of Prof'l Journalists, Sigma Delta
 Chi. v. Martin,*
 556 F.2d 706 (4th Cir. 1977) ............................................................ 59

*Citizens United v. FEC,*
 558 U.S. 310 (2010) .......................................................................... 57

*Claybrook v. Slater,*
 111 F.3d 904 (D.C. Cir. 1997) ......................................................... 56

*Cohen v. Crowles Media Co.,*
 501 U.S. 663 (1991) .................................................................... 60, 61

*Cromer v. Brown,*
 88 F.3d 1315 (4th Cir. 1996) ............................................................ 48

*D.H. Overmyer Co. v. Frick Co.,*
 405 U.S. 174 (1972) .................................................... 35, 37, 39, 42

*Davies v. Grossmont Union High School Dist.,*
 930 F.2d 1390 (9th Cir. 1991) ................................................... *passim*

*Erie Telecomms. Inc. v. City of Erie,*
 853 F.2d 1084 (3d Cir. 1988) .................................................. 34, 36, 39

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ................................................................ 29

*Greenhouse v. MCG Capital Corp.,*
392 F.3d 650 (4th Cir. 2004) ................................................ 25

*Harrods Ltd. v. Sixty Internet Domain Names,*
302 F.3d 214 (4th Cir. 2002) ........................................ 25, 54

*Houck v. Substitute Trustee Servs., Inc.,*
791 F.3d 473 (4th Cir. 2015) ................................................ 25

*Iowa v. Tovar,*
541 U.S. 77 (2004) ................................................................ 34

*Jordan v. Fox, Rothschild, O'Brien & Frankel,*
20 F.3d 1250 (3d Cir. 1994) ................................................ 43

*Journal Pub. Co. v. Mechem,*
801 F.2d 1233 (10th Cir. 1986) ........................................... 59

*Lake James Cmty. Vol. Fire Dep't, Inc. v. Burke Cty., N.C.,*
149 F.3d 277 (4th Cir. 1998) ...................................... *passim*

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................ 54, 55

*Malvo v. Mathena,*
254 F. Supp. 3d 820 (E.D. Va. 2017) ................................... 34

*Manning v. Mercatani,*
898 F. Supp. 2d 850 (D. Md. 2012) ..................................... 39

*Melanson v. Browning-Ferris Indus., Inc.,*
281 F.3d 272 (1st Cir. 2002) ............................................... 40

*Minnick v. Mississippi,*
498 U.S. 146 (1990) .............................................................. 34

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) ................................................ 31, 32, 51

*Pitt Cnty. v. Hotels.com, L.P.*,
553 F.3d 308 (4th Cir. 2009)...................................................56

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972)..............................................................23

*Radio & Television News Ass'n v. U.S. Dist. Court for Cent.*
*Dist. of Ca.*,
781 F.2d 1443 (9th Cir. 1986)................................................59

*Roth v. United States*,
354 U.S. 476 (1957)........................................................22, 23

*Rust v. Sullivan*,
500 U.S. 173 (1991)............................................................26

*Sambo's Rests., Inc. v. City of Ann Arbor*,
663 F.2d 686 (6th Cir. 1981).................................................40

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976)..............................................................56

*Snepp v. United States*,
444 U.S. 507 (1980)............................................................50

*Stanley v. Georgia*,
394 U.S. 557 (1969)............................................................28

*United States v. Alvarez*,
567 U.S. 709 (2012)............................................................48

*United States v. Gurney*,
558 F.2d 1202 (5th Cir. 1977)...............................................59

*United States v. Lattimore*,
87 F.3d 647 (4th Cir. 1996)..................................................40

*United States v. Marchetti*,
466 F.2d 1309 (4th Cir. 1972).........................................50, 51

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)............................................................46

*White Tail Park, Inc. v. Stroube,*
   413 F.3d 451 (4th Cir. 2005)......................................................55, 56

*Whitney v. California,*
   274 U.S. 357 (1927)....................................................................22, 28

*Wikimedia Found. v. Nat'l Sec. Agency,*
   857 F.3d 193 (4th Cir. 2017)..............................................................54

## Statutes

28 U.S.C. §1291 .......................................................................................1

28 U.S.C. §1331 .......................................................................................1

Md. Code Ann., Crim. Proc. § 10-105(c)(1).............................................7

## Rules

Fed. R. Civ. P. 12(b)(6) ..........................................................................25

Fed. R. Civ. P. 56...................................................................................25

## U.S. Constitution

U.S. CONST. amend. I.......................................................................*passim*

## Other Authorities

*The Baltimore Sun* (Oct. 10, 2015)........................................................38

Correll, Wittenbrink, Park, Judd, Sadler, and Keesee, *Across
   the Thin Blue Line: Police Officers and Racial Bias in the
   Decision to Shoot*, 92 J. of Personality and Social
   Psychology No. 6 (2007) ..................................................................41

James Madison, 4 Annals of Congress 934 (1794) ................................21

Louis D. Brandeis, *Other People's Money and How the
   Bankers Use It* 92 (1914)..................................................................22

Press Release, U.S. Dep't of Justice, Justice Department
Reaches Agreement with City of Baltimore to Reform
Police Department's Unconstitutional Practices (Jan. 12,
2017) .................................................................................... 13

THE SALT LAKE TRIBUNE (August 1, 2017) ............................... 53

Smith and Holmes, *Community Accountability, Minority
Threat, and Police Brutality: An Examination of Civil
Rights Criminal Complaints* ............................................... 41

U.S. Dep't of Justice, Civil Rights Division, Investigation of
the Baltimore City Police Dep't 8 (2016) ................................... *passim*

## STATEMENT OF JURISDICTION

Because this case presents federal questions arising under the First Amendment to the United States Constitution, the District Court had subject matter jurisdiction under 28 U.S.C. §1331. And because the district court dismissed all claims in favor of Appellees, and Appellants timely filed a notice of appeal, this Court has jurisdiction under 28 U.S.C.§1291.

## STATEMENT OF THE ISSUES

Between 2009 and the filing of the complaint below, the City of Baltimore ("Baltimore" or the "City") paid more than $30 million to settle civil cases filed against the City and its police department and officers for violations of individual civil rights and liberties. Nearly all of those settlement agreements (approximately 95%) contained non-disclosure / non-disparagement clauses that gagged the settling plaintiffs (but not the City) from commenting on any aspect of their settled cases under penalty of losing half their settlement proceeds.

This appeal presents the following issues for review:

1.      Whether the City of Baltimore's non-disparagement policy —
which by its terms prohibits "any attempt" by the settling plaintiff "at
defaming and/or disparaging" the City or its officers in relation to, or
"discussing any opinions, facts or allegations in any way connected to,"
the settled case — violates the First Amendment on its face.

2.      Whether, in applying the non-disparagement policy to
Ashley Overbey, the City violated Ms. Overbey's First Amendment
rights by withholding half of her settlement proceeds *because of*
comments she posted online, about events precipitating her civil rights
lawsuit against the City, in response to comments made by the City
Solicitor and reported in the Baltimore Sun newspaper.

3.      Whether the district court erred in finding, prior to any
discovery, that Ms. Overbey knowingly and voluntarily waived her First
Amendment right to speak about her civil rights case in the manner she
did.

4.      Whether Baltimore Brew, a news organization, has standing
to challenge on First Amendment grounds the City's non-disparagement
policy that, in the case of settled civil rights lawsuits, restricts press

access to the best source of factual information about alleged police brutality and civil rights violations: the victims.

## STATEMENT OF THE CASE

Ms. Overbey filed a civil rights complaint against Baltimore in 2012, alleging police brutality. She and the City settled in 2014 pursuant to an agreement that contained the City's boilerplate gag provisions, including a clause prohibiting a settling plaintiff from saying anything defamatory or disparaging about the City or its police officers, or really anything at all, as it related to the settled case. In reporting on the proposed settlement to the Baltimore Board of Estimates, as required by law, the City Solicitor made certain misleading comments about Ms. Overbey's conduct toward the police. Those comments were reported by the *Baltimore Sun* and triggered harsh criticisms of Ms. Overbey and her motives on the *Sun*'s blog and Facebook page, which in turn prompted Ms. Overbey to respond in her own defense. When it came to the City's attention that Ms. Overbey had commented online about her case, the City (which had not yet disbursed her proceeds) decided on its own to withhold half her proceeds.

The Baltimore Brew ("the Brew") is a news media organization that, among other things, reports on local issues such as police misconduct in Baltimore City. In the course of its efforts to report on accounts of police brutality, the Brew has been told repeatedly by settling civil rights plaintiffs that they will not speak to the Brew *because of* the non-disparagement clause in their settlement agreements.

## I.      FACTUAL BACKGROUND

### A.      Ashley Overbey

In April 2012, Ashley Overbey — then a 25-year old Black woman and mother of two young children — was brutally assaulted by Baltimore City police officers who had responded to a 911 call placed by Ms. Overbey to report a breaking and entering of her apartment. JA 023, 199. The three responding officers treated Ms. Overbey as a perpetrator and, without provocation, slapped, punched, beat, and tased her. JA 025. They also assaulted her mother, who lived with her. Following the police assaults upon them, Ms. Overbey and her mother were both arrested. JA 024. During the encounter, the officers were cruel and vicious, making derogatory comments to Ms. Overbey such as "you talk too much, bitch" and "shut the fuck up, bitch," and physically

subduing her in a manner that made it hard for her to breathe. Ms. Overbey was jailed briefly. JA 025. Eventually, the Office of the State's Attorney for Baltimore City dropped the charges against her and her mother. JA 025.

Hurt, humiliated, and violated, Ms. Overbey sued the City of Baltimore and its police department for violations of her civil rights. JA 025, 199. After two years of her case moving slowly through the judicial system, during which time Ms. Overbey and her children lost their home due to her inability to find work on account of her arrest record, Ms. Overbey was advised by her attorney — who represented her on contingency — to settle for a small fraction of her claimed damages. JA 027, 199, 233. As it did in approximately 95 percent of its settlements of civil rights cases, the City insisted on non-disclosure and non-disparagement provisions, the violation of which allowed the City the right to seek *reimbursement* of 50 percent of the settlement proceeds. JA 026-27, 200. The relevant part of the agreement stated:

> It is understood and agreed by the Settling
> Parties that in exchange for the payment of the
> Settlement Sum by the Released Parties, the
> Releasing Party, and that party's agents,
> representatives and attorneys *shall strictly
> refrain from and avoid any attempt at defaming*

*and/or disparaging the Released Parties*, including each of the Released Parties' employees or agents regarding any matter related to, or arising from, the Litigation or the Occurrence. Further, in exchange for the payment of the Settlement Sum by the Released Parties and because the allegations of the Occurrence and Litigation are disputed, the Settling Parties agree that *the Releasing Party and his or her agents, representatives and attorneys, shall limit their public comments regarding the Litigation and the Occurrence to the fact that a satisfactory settlement occurred involving the Parties.* It is understood and agreed by the Settling Parties that *this limitation on public statements shall include a prohibition against discussing any opinions, facts or allegations in any way connected to the Litigation or the Occurrence, or substance of any prior settlement offers or discussions with the news media,* except that the Releasing Party's counsel may indicate that the Litigation has been settled to avoid the cost, time, expense and uncertainties of protracted litigation.

The Settling Parties agree and understand that a breach of the obligations set forth in this Paragraph 9 is deemed by the Settling Parties to be a material breach of this Agreement for which the City is entitled to a *refund* of fifty percent (50%) of the Settlement Sum ($31,500.00) from the Releasing Party. The remainder of the Settlement Sum and all other obligations of this Agreement shall remain in force. If it is necessary for the City to pursue recovery in litigation of the refund it is entitled to under this paragraph, the City will be entitled to recover all reasonable attorneys fees, costs and expenses of such litigation from the Releasing Party.

JA 026-27, 200 (emphasis added).

Ms. Overbey understood that this provision only gagged her with respect to talking directly to the news media (*i.e.*, reporters), and she also thought that it applied with equal force to the City. JA 027, 201. She was not aware she could try negotiating with the City to remove the gag provisions, and her attorney did not advise her that the gag provisions were open for negotiation. JA 233. Her attorney also advised that if she did not accept the settlement, it could be several more years before she obtained a resolution and possible money judgment. JA 233, 300.

By that point in time, Ms. Overbey was living hand to mouth, had a third child, and was struggling mightily to feed her family. Although the criminal charges against her had been dropped, her record of arrest adversely impacted her ability to find work — employers did not want to hire her because of that record.[1] JA 199, 233. Desperate for whatever recovery she could obtain, she agreed to the settlement in August 2014, inclusive of the gag provisions.

───────────────

[1] Unless the arrested party waives her right to file civil charges, an arrest remains on record for three years under Maryland law. Md. Code Ann., Crim. Proc. § 10-105(c)(1).

Several weeks later, on September 15, 2014, unbeknownst to Ms. Overbey and before she had received the settlement proceeds, the *Baltimore Sun* newspaper published her name, mug shot, address, and settlement amount, as part of its report on proposed police settlements being considered for approval by the City's Board of Estimates as required by local law. JA 028. Accompanying the information about her settlement was an explanatory statement by the City Solicitor that, in substance, pinned blame for Ms. Overbey's altercation with the police on Ms. Overbey herself, characterizing her disposition as "hostile" to the responding police officers. JA 028, 201.

Those published comments of the City Solicitor prompted multiple critical comments about Ms. Overbey posted on a blog associated with the *Sun*. The anonymous commenters accused Ms. Overbey of initiating a confrontation with the police on purpose as a lever to extract a payout from the City. All of this was called to Ms. Overbey's attention by a friend. When Ms. Overbey reviewed the *Sun* article she was surprised and unsettled, fearing the consequences of having just been identified by name and location as someone in receipt of what would probably seem to many in nearby impoverished areas as a large payout. JA 028.

She feared the article would make her and her family targets for robbery. JA 028. More upsetting still were the blog comments depicting her as an avaricious huckster just making up a story to get a payout. JA 029.

Infuriated and confused by the City's commentary reported in the *Sun* — which she thought the settlement agreement prohibited — she did what most people would do in that situation: she responded on the blog to the mischaracterizations of her actions, as portrayed by the City Solicitor, and stressed that she was the victim of the police. JA 029. Her exchange with commenters on the *Sun*'s blog site read as follows:

> Co.Owner: "I'm sorry for your experience, but pushing a Police Officer does not work. No matter what your race is, you never touch a police officer; you do answer all questions; and assist when possible. I would rather be shot by a Taser, then a bullet. I can"t wait until you need their help in the future. Enjoy the money!!"

> Ms. Overbey replied: "I am the woman who this article is talking about AND THE POLICE WERE WRONG!! This article doesn't come close to WHAT REALLY HAPPENED or tell how three men over 200 lbs each beat me (115 lbs) bruises all over my body a black eye AND tased twice all in front my 2 yr old daughter so before you decide to put ur MEANINGLESS opinion in on something FIND OUT THE FACTS FIRST! IF I were wrong my charges wldntve ben thrown out

and i wldntve received a dime.  Its people like you who make this cite the ****it…"

MissDaisy:  "So, OK, I can call the cops, assault one of them, get tased and get paid!  Sounds like a plan!"

Ms. Overbey replied:  "I am the woman who this article is talking about AND THE POLICE WERE WRONG!!  This article doesnt come close to WHAT REALLY HAPPENED or tell how three men over 200 lbs each beat me (115 lbs) bruises all over my body a black eye AND tased twice all i nfront my 2 yr old daughter so before you decide to put ur MEANINGLESS opinion in on something FIND OUT THE FACTS FIRST!  IF I were wrong my charges wldntve ben thrown out and i wldntve received a dime. Its people like you who make this cite the ****it…"

Ms. Overbey continued:  "AND THIS WAS ALL AFTER I CALLED THEM FOR HELP AFTER MY HOME HAD BEEN BURGULARIZED WHILE I WAS AT WORK!!  SO ANYONE WHO HAS ANYTHING TO SAY (NEGATIVITY) YOU CAN TAKE UR OPINION AND SHOVE IT!!"

Ms. Overbey added:  "I pay my taxes and support myself like everyone else but unlike a lot of other people I KNOW MY RIGHTS and I refused to let them get away with this AGAIN!!"

JA 029-30.

Meanwhile, an even more heated exchange unfolded on the *Sun*'s Facebook page, where the negative comments of others — again seizing on the City Solicitor's mischaracterizations about Ms. Overbey's conduct

— became racially charged while accusing Ms. Overbey of taking intentional steps toward collecting a taxpayer-funded payout. JA 115, 176-81. Ms. Overbey responded in an effort to clarify what happened, stating in reference to the City Solicitor's comments in the *Sun* that "this article is no where near CLOSE TO WHAT REALLY HAPPENED!!!" JA 178.

Her posts caused the City to take the action that gives rise to this lawsuit: upon learning of her commentary, the City — unilaterally and without process — decided to withhold half of the agreed-upon settlement amount of $63,000. To that end, under cover of a letter dated October 8, 2014, the City sent Ms. Overbey's attorney a check for $31,500, explaining that the City was withholding the other half of the agreed-upon proceeds in light of Ms. Overbey having "made a number of comments regarding the case." JA 183. After her attorney took his one-third contingency share of the *full* settlement amount, she was left with about $11,000. JA 201.

## B.    Baltimore Brew

The Baltimore Brew is a news organization that has been reporting on police misconduct and related lawsuits since 2011,

including the City's continuing use of taxpayer funds to compensate victims of police misconduct, and how that affects accountability for officer behavior. JA 031, 202. The Brew obtains most of its information about the City's expenditure of money to settle police abuse lawsuits by attending Board of Estimates meetings because the Board of Estimates is required to approve settlements for amounts exceeding $25,000. JA 031, 202. After each settlement is approved, the City releases a memorandum describing the dispute and the amount paid by the City. JA 031, 202. These memoranda rely primarily on the accounts of the officers involved in the dispute as drafted by the police department's counsel. JA 031, 202. When the Baltimore Brew inquired of City Solicitor George Nilson about the City's settlements, Mr. Nilson was willing to discuss the terms of the settlement and the incident that gave rise to the settlement, but informed the Brew that victims of police brutality who settle with the City were prohibited by virtue of the settlement agreements from discussing the facts of their cases. JA 031-32, 202. When the Brew contacted victims, victims informed the Brew that they could not speak *because of* the non-disparagement clauses in their settlement agreements. JA 032. As a result, the Brew has been

forced to rely for its reporting solely on the accounts provided by the City and the civil complaints filed against the City.

## C.     The Department of Justice Report on Baltimore Policing

During the relevant timeframe, albeit independent of Ms. Overbey's own experience, the United States Department of Justice ("DOJ") investigated the Baltimore City Police Department for systemic civil rights abuses. In its August 10, 2016 report on its "Investigation of the Baltimore City Police Department,"[2] the DOJ concluded that the police department engages in a "pattern or practice" of "(1) making unconstitutional stops, searches and arrests; (2) using enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches, and arrests of African Americans; (3) using excessive

---

[2] U.S. Dep't of Justice, Civil Rights Division, Investigation of the Baltimore City Police Dep't 8, 10 (2016), https://www.justice.gov/opa/file/883366/download ("DOJ Report"). The investigation ultimately led to a consent decree with Baltimore requiring certain reforms. Press Release, U.S. Dep't of Justice, Justice Department Reaches Agreement with City of Baltimore to Reform Police Department's Unconstitutional Practices (Jan. 12, 2017), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-city-baltimore-reform-police-department-s.

force; and (4) retaliating against people engaging in constitutionally protected expression." DOJ Report at 3.

The DOJ attributed the police department's continued inability to police "effectively and within the bounds of the federal law" to a lack of accountability for police misconduct. *Id.* It stated that "persistent failure to hold officers accountable for misconduct contributes to an erosion of the community trust that is central to effective law enforcement," *id.* at 139, and that this is particularly the case within the Black community, noting that the "targeted policing of certain Baltimore neighborhoods with minimal oversight or accountability disproportionately harms African-American residents," *id.* at 7.[3] Not surprisingly, the DOJ found that this pattern and practice of conduct violates the First, Fourth, and 14th Amendments of the Constitution as well as federal anti-discrimination laws. *Id.* at 9, 22, 27, 118 & n.117

## II.    PROCEDURAL POSTURE

Appellants sued the City and its police department in federal district court on June 29, 2017, alleging claims under both the First

_____

[3] *See* DOJ Report at 61 (88% of the subjects of non-deadly force used by Baltimore police officers are African-American).

Amendment and state law. The City moved to dismiss or for summary judgment; the police department moved separately to dismiss. Following briefing, and without affording Appellants a hearing as requested, the court issued a one-page memorandum and an accompanying one-page order on October 10, 2017, dismissing Ms. Overbey's First Amendment claim and closing the case. This ruling did not address Ms. Overbey's state law claims or the Brew's separate First Amendment claim.

On October 13, 2017, the chief judge of the district court directed the clerk of court to reopen the case, citing the court's failure to fully address Appellants' claims before dismissing the case. On October 18, the case was reassigned to another judge who, following a status call with counsel, rescinded the previous order, invited and received a motion to reconsider from Appellants, and scheduled a hearing for November 16 on the substance of the previously filed motion papers.

After hearing oral argument, the court dismissed all claims. Regarding the claims against the police department, the district court dismissed the police department because it was not, in the court's opinion, a real defendant in interest. Regarding Ms. Overbey's claims

against the City, the court granted summary judgment, finding that Ms. Overbey had waived her First Amendment rights by signing the settlement agreement, inclusive of the non-disparagement clause, and that her state law claims were untimely. The district court dismissed the Brew's claims on standing grounds.

Appellants timely filed their notice of appeal on December 20, 2017. In this appeal, they press only their respective First Amendment claims.

## SUMMARY OF ARGUMENT

There is no question that the City's standard gag provisions in place at the time Ms. Overbey settled her civil rights complaint were designed and enforced to protect the City, its officials, and its police officers from public knowledge and criticism of alleged official misconduct. By their very terms, the offending provisions take aim at all "defamatory" or "disparaging" remarks by a settling plaintiff in connection with the settled case, and tell settling plaintiffs that they may not utter "any opinions, facts or allegations" about the settled case. The clause is unconstitutional, for government may no more silence its critics through purchase than it may through edict.

The questions for this Court on appeal go to the core of the First Amendment and the foundational idea that government is not like private parties. This case is not about the legality of *private* settlement agreements and the right of *private* parties to agree both will remain silent about the terms of settlement and not say anything disparaging of one another. This case is, rather, about *governmental* action and the constitutional limits on what *government* can demand as a condition of settlement. Government does not sit in the same shoes as private parties, and it can neither expect nor demand to be treated as such. Government operates for its citizens; its ability *qua government* to demand silence about its actions is limited.

Lurking prominently in the background of this case, moreover, is an issue of civil rights, and the right of the public to be informed about the actions of its police departments, especially where those actions raise concerns of police brutality. The combination of smart devices and social media in recent years has thrust disturbing images of police brutality across the country into the national spotlight, especially in our predominantly Black communities and as directed toward Black citizens. Indeed, the 2015 killing of Freddie Gray while in police custody

in Baltimore placed the City at the epicenter of what history may teach was a great social awakening to the ongoing crisis of race relations in our nation's police departments.

The City will no doubt respond that the recent notoriety of cases of police brutality incidents in Black communities across the country is, while disturbing, irrelevant. The City will maintain that this case is a garden-variety contract claim. The Court should not be swayed. First, government may no more purchase silence than it may demand it. Second, the civil rights backdrop to this lawsuit is no more irrelevant here than, for example, the effects of racial segregation in our nation's schools were to the Supreme Court when, in 1954, it declared the concept of "separate but equal" unconstitutional. Facts matter. History matters. The spirit and purpose of the First Amendment matter. To ignore the civil rights backdrop of this case is to become part of the historical problem.

Appellants' legal claims and the relief sought fall in the heartland of the promise of the First Amendment to the People: speech about matters of significant public interest and importance may not be squelched or punished by the government. Whether it is for $1 or

$31,500, or millions of dollars, government may not threaten to penalize nor actually penalize its citizens for speaking truth to power. And it may not thwart the distinct First Amendment rights of the press to investigate and report on matters of public concern by silencing through economic coercion those who are otherwise not only willing speakers, but the very individuals who have the most relevant testimony to share on the subject.

In this case, the Court should, first and foremost, declare unconstitutional on its face Baltimore's policy of prohibiting "defamatory" or "disparaging" comments about the City or its police department or officers, and silencing all public commentary about the case — whether expressed as opinion, fact, or allegation — as a condition of settlement. Government may never muzzle a citizen, even as a condition of a settlement agreement, merely for convenience or to avoid further embarrassment or public scrutiny. If the policy is not facially unconstitutional, then the Court should declare Baltimore's non-disparagement and gag policy unconstitutional as it was applied to Ms. Overbey inasmuch as, among other things, the City fails to articulate any bona fide public interest served by the inclusion of the

non-disparagement and gag provisions in its standard settlement agreement. The Court should also conclude that the district court erred in dismissing this case without affording an opportunity for discovery on disputed issues of material fact.

Finally, the Court should hold that where there is alleged to exist a non-disparagement and general gag policy of the type at issue in this case, a media entity (such as the Brew) that has alleged in a well-pleaded complaint that it routinely reports on the subject of the settled lawsuit has standing in its own right to challenge on First Amendment grounds the constitutionality of the non-disparagement and gag policy as it applies generally.[4]

---

[4] As for the Baltimore Police Department, the public record does not disclose whether the department is responsible, at least in part, for the implementation of the policy. The trial court simply assumed that it was not, but there has been no fact discovery on that point. *See* JA 303. The public record does not reveal whether the police department's interest in the policy is merely a reputational one; tellingly, the department had separate counsel below. If what binds the City binds the police department, Appellants need not press their case against the police department.

**ARGUMENT**

## I. THE CITY OF BALTIMORE'S NON-DISPARAGEMENT POLICY VIOLATES THE FIRST AMENDMENT.

At issue is the right of government to demand silence as a price of settlement. Appellants do not quarrel with the City's desire for closure as a conceptual matter. But closure and suppression of speech are neither equivalents nor necessary companions; obtaining the former does not require the latter. In private disputes, of course, insistence on silence is a rational demand because private individuals and entities are not accountable to the public at large and have an interest in keeping private matters private. Importantly, they are also not subject to constitutional constraints. In contrast, a government's accountability to the public — a most basic American ideal — prevents it from erecting barriers to a free and open public discourse about its workings. Government does not retain an analogous interest in keeping its activity private, especially where the activity concerns systematic, frequent, and direct interaction with citizens.

Since our nation's founding, freedom of speech has been seen as essential to holding our public institutions and leaders accountable. *See* James Madison, 4 Annals of Congress 934 (1794) ("The censorial power

is in the people over the government, and not in the government over the people."). Sunlight, it goes, is the best disinfectant. *See* Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914). *E.g.*, *Whitney v. California*, 274 U.S. 357, 375-76 (1927). And thus it is that the first ratified amendment to our national charter declared that government could enact no law abridging the freedom of speech. U.S. CONST. amend. I

As interpreted by the City, the provision challenged here prohibited Ms. Overbey, on pain of losing half her settlement proceeds, from "defaming or disparaging" the City of Baltimore in any matter arising from or relating to her treatment by the police, and categorically proscribed her from discussing "any opinions, facts or allegations in any way connected" to her dispute with the City. A policy such as this, imposed in 95 percent of the City's settlement agreements and intended specifically to curtail what otherwise would be protected speech, is anathema to the First Amendment — it is, by design, an abridgment of free speech.

As the Supreme Court recognized in *Roth v. United States*, the freedom to comment on issues of public concern is necessary to "assure

[the] unfettered interchange of ideas for the bringing about of political and social changes." 354 U.S. 476, 484 (1957). In insisting on the non-disparagement clause as a condition of settlement, the City runs afoul of the basic First Amendment tenet that government cannot limit speech in the interest of protecting its own reputation, *see Bridges v. California*, 314 U.S. 252, 269–70 (1941), or "because of its message, its ideas, its subject matter, or its content," *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Because the City of Baltimore's non-disparagement and gag policy is not consonant with that most basic right, this Court should declare it unconstitutional on its face.

If not unconstitutional on its face, the policy is at least unconstitutional as it was applied to Ms. Overbey. Whatever merit to the theory that *some* settling party might truly negotiate away his or her right to speak freely about matters as important as one's own victimization at the hands of the police, it was certainly not the case with Ms. Overbey. Nothing in the record suggests that her so-called agreement not to defame or disparage the City or its police, and otherwise refrain from opining on her treatment or the surrounding circumstances related to her case, was the product of a negotiation. It

was, by all indications, a contract of adhesion. The Court should hold that, if it is not facially unconstitutional, the non-disparagement policy is at least presumptively unconstitutional, and rebutting that presumption of unconstitutionality requires Baltimore to prove that, at minimum: (1) Ms. Overbey knowingly and voluntarily understood and agreed to be gagged to the extent Baltimore has construed the non-disparagement clause and related gag provisions; and (2) the non-disparagement and related gag provisions were themselves the product of a bona fide negotiation, *i.e.*, an express focus of the parties' talks. The Court should hold that it is not enough for the City to show that Ms. Overbey was represented by counsel or that Ms. Overbey signed an agreement containing boilerplate language.

Finally, given that Baltimore's burden turns on facts — in particular, Ms. Overbey's understanding at the time of signing — the Court should hold that a trial court abuses its discretion by granting summary judgment without the benefit of discovery (or a stipulation regarding material facts).

## A.    Standard of Review

This Court reviews the district court's order granting the City's motion for summary judgment and the police department's motion to dismiss *de novo*, applying the same standards as the district court. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir. 2004) Dismissal is not appropriate under Rule 12(b)(6) so long as the factual allegations "state a claim to relief that is plausible on its face," regardless of the plausibility of any alternative explanation. *Houck v. Substitute Trustee Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (internal quotation marks and citation omitted). Similarly, summary judgment is not appropriate where genuine issues of material fact are in dispute. *See* Fed. R. Civ. P. 56; *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("Generally speaking, summary judgment must be refused where the nonmoving party has not had the opportunity to discover information that is essential to his position.") (citations and internal quotation marks omitted). The Court applies an abuse of discretion standard to a refusal to permit discovery before summary judgment. *Harrods*, 302 F.3d at 244.

## B. Baltimore's Non-Disparagement Policy Is Facially Unconstitutional.

Whether a government policy is facially unconstitutional is determined by asking whether there is any set of circumstances under which it can be applied in a manner consonant with the Constitution. *See Rust v. Sullivan*, 500 U.S. 173, 183 (1991). Where there is none, it must be stricken.

The offending verbiage in the settlement agreement (both Ms. Overbey's specifically and the City's general template in use at the time) demanded that the settling plaintiff "shall strictly refrain from and avoid any attempt at defaming and/or disparaging the Released Parties" regarding the settled litigation; "shall limit their public comments" regarding the litigation "to the fact that a satisfactory settlement occurred involving the Parties"; and shall be prohibited from "discussing any opinions, facts or allegations in any way connected to the Litigation." The City defended the non-disparagement policy[5] by arguing that it serves the City's aim of avoiding "a trial in the court of

_____

[5] As used in this brief, any reference to the "non-disparagement clause" or "non-disparagement policy" should be interpreted to encompass reference to the prohibitions on "defaming" and "defamatory" speech and public discussions of opinion, fact, or allegation related to the case.

public opinion." ECF 11-1 at 4. In other words, on its own terms and as defended by its attorneys in this litigation, the City's non-disparagement clause is aimed intentionally at prohibiting settling plaintiffs — which in most cases, and certainly Ms. Overbey's case, means U.S. citizens or residents with constitutional rights — from criticizing the City or speaking out publicly about anything regarding their treatment by the police.

Insulation from public opinion subverts the purpose of the form of government so critical to this nation's founding and identity.  Under no set of circumstances may government lawfully silence into perpetuity victims of police misconduct through non-disparagement clauses and general gag provisions in settling civil rights lawsuits. The City's policy takes direct aim at victims of police brutality who have settled with the City by prohibiting them, on pain of pecuniary punishment, from "defaming or disparaging" the City in any matter arising from or relating to their treatment by the police, or expressing any opinion, fact, or allegation regarding their settled civil rights lawsuits. To make matters worse, the City retains for itself the right to decide the scope of the gag and whether it has been violated. The whole purpose of the

First Amendment is to protect "the freedom to think as you will and to speak as you think" in the furtherance of "discovery and spread of political truth," *Whitney*, 274 U.S. at 375 (Brandeis, J., concurring), yet the City, through its non-disparagement policy, upends that freedom.

The Founding Fathers understood that policies like the City's are counterproductive and corrosive:

> [T]hey knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies, and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law–the argument of force in its worst form.

*Whitney*, 274 U.S. at 375 (Brandeis, J., concurring).

"Our whole constitutional heritage rebels at the thought of giving the government the power to control men's minds." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). The non-disparagement policy is aimed at shaping public opinion — about the City and its police department — by silencing criticism from its chief critics: victims. This case is thus centrally about government's "power to control men's minds," and it thus is centrally about ensuring that government and its institutions

operate with the consent of the governed and not through silencing criticism by way of economic coercion, *inter alia.*

The non-disparagement policy impinges on the news media's own First Amendment right to seek out news of public importance by gagging the best sources of that news. The policy silences the otherwise willing speaker, and, in the process, impedes the public's right to be informed about the operation of its own institutions. *See Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it[.]" (citation and internal quotation marks omitted)).

The offending provision cannot fairly be justified as being part of an "agreement." Government may not seek to induce through economic coercion or purchase the very silence that it is prohibited by the First Amendment from demanding in the first instance under its police powers. If, by way of comparison, the City of Baltimore enacted an ordinance that authorized the City to pay $50,000 to any resident who would swear an oath to never say a bad word again about the City or its police department, surely that ordinance would be found abhorrent to

the First Amendment and the values it promotes. *Cf. Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991) ("Just as we would not enforce a contract stating that voter X will vote for candidate Y in exchange for a sum of money, so too we will not enforce an agreement whereby a citizen receives money in exchange for a promise not to exercise his right to run for office."). Inasmuch as the City's use of non-disparagement clauses in settlement agreements with victims of police brutality is systemic — 95% — it is no less pervasive than a codified ordinance. And because it serves no purpose but to shield the City from criticism and curtail public discussion about the unsavory aspects of its police department, it is no less unconstitutional than a similarly worded ordinance would be.

Moreover, and to state the obvious, the topic here matters. What is being suppressed here is newsworthy in no small measure: stories, like Ms. Overbey's, of police brutality — stories that may shed more light on the state of policing in Baltimore, race-based practices and outcomes, and how the City does and should respond. What is being suppressed are stories of the very practices that led the U.S. Department of Justice to find the City's police department culpable for

a pervasive use of excessive force and retaliation against those who engage in constitutionally protected expression. *See* DOJ Report at 3.

What victims of police brutality have to say about the City's police department is important. Difficult and messy? Yes. Embarrassing to the City? Possibly. But they are important in a big way. The ubiquity of smart phones has enabled disclosure and discussion of graphic and hard-to-watch incidences of police brutality and killings — especially as directed at Black and other minority communities — all of which have stimulated the conversations across racial, social, and national lines of a significant problem within our police departments. This subject matter is of the highest order of public importance.

The City's use of non-disparagement clauses to whitewash wrongdoing, by preventing victims of police brutality from discussing the circumstances of their abuse, runs counter to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Silencing the first-hand witnesses to events of

great public importance, or punishing them financially when they will not be silenced in the face of the government's disparagement, flouts the guarantees of the First Amendment. Accordingly, the non-disparagement and related verbiage of the settlement agreement should be held to be unconstitutional on its face and prohibited from further use.

C.    **If Not Facially Unconstitutional, Baltimore's Non-Disparagement Policy Is Unconstitutional as Applied.**

Exacting punishment against police abuse victims for engaging in protected speech is no less a violation of the First Amendment than imposing a prior restraint on protected speech in the first instance. *See*, *e.g.*, *Sullivan*, 376 U.S. at 270 (reversing a civil judgment against a newspaper for running an advertisement criticizing a public official acting in his official capacity); *Bridges*, 314 U.S. at 270 (rejecting the notion that government can sanction individuals in the interest of protecting "respect for the judiciary," stressing that "it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions"). The punishment is all the more unseemly in this case given the City's unilateral determination,

without any process, that Ms. Overbey violated the non-disparagement clause.

Perhaps more unseemly still is the fact that Ms. Overbey was punished for comments that were prompted by criticisms directed at her as a result of the City Solicitor's own misleading comments made about her and published in the *Baltimore Sun*. In other words, the City punished Ms. Overbey for commenting on subject matter that it teed up publicly through its own commentary. While the lack of mutuality in the settlement agreement is not the direct cause of the First Amendment violation, it does highlight the danger of allowing government to control the levers of speech.

In the district court, the City defended its actions by arguing that Ms. Overbey waived her First Amendment rights by signing the settlement agreement and that the non-disparagement policy furthers legitimate government interests in closure and avoiding "a trial in the court of public opinion." ECF 11-1 at 18. The district court agreed. JA 362. Even if the non-disparagement policy is not unconstitutional on its face, this Court should reject the City's reasoning and reverse the

district court in light of the factually intensive nature of determining whether someone has waived her First Amendment rights.

The Court considers, first, whether the purported waiver was made knowingly and voluntarily, and, second, whether enforcing the waiver would undermine the public's interest in the efficient and accountable provision of policing services. *See Lake James Cmty. Vol. Fire Dep't, Inc. v. Burke Cty., N.C.*, 149 F.3d 277, 280 (4th Cir. 1998). "The Supreme Court has noted that waiver is ordinarily an intentional relinquishment of a known right or privilege, and has instructed courts to indulge in every reasonable presumption against waiver of fundamental constitutional rights and not to presume acquiescence in the loss of such rights." *Erie Telecomms. Inc. v. City of Erie*, 853 F.2d 1084, 1095 (3d Cir. 1988); *see also Malvo v. Mathena*, 254 F. Supp. 3d 820, 833 (E.D. Va. 2017) ("As the Supreme Court has stated, a waiver of constitutional rights must be knowing, meaning that it must be an intentional relinquishment of a known right that is done with a sufficient awareness of the relevant circumstances." (citing *Iowa v. Tovar*, 541 U.S. 77, 81 (2004) and *Minnick v. Mississippi*, 498 U.S. 146, 159 (1990)). Moreover, the burden is on government to demonstrate

waiver by clear and convincing evidence. *See D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972).

The district court erred in determining conclusively and without discovery that Ms. Overbey waived her First Amendment rights and that the City had a legitimate public interest in utilizing and enforcing its non-disparagement policy with respect to Ms. Overbey. As explained below, Ms. Overbey did not knowingly and voluntarily waive her rights to the extent the City and lower court concluded she had. Moreover, the City's purported desire for closure is achieved through Ms. Overbey's agreement to drop her lawsuit alone; her future silence is immaterial and unnecessary to *that* objective. In any event, the City's desire to be spared further criticism is a privilege government does not enjoy under our Constitution.

### 1. Ms. Overbey Neither Knowingly Nor Voluntarily Waived Her First Amendment Rights.

The district court erred in concluding that Ms. Overbey knowingly and voluntarily waived her rights, despite her sworn and unrebutted declaration that she did not fully grasp the scope of the non-disparagement clause in her settlement agreement as the City would later apply it. In doing so, the district court relied on its conclusions

that (1) she was represented by counsel, and (2) the settlement agreement was not a contract of adhesion. Neither conclusion disposes of the waiver issue.

### a. *Ms. Overbey Did Not Understand the Waiver to Prevent the Actions She Took.*

Courts enforce the waiver of an individual's constitutional rights only if "the facts and circumstances . . . make it clear that the party foregoing its rights has done so . . . with *full understanding of the consequences of its waiver.*" *Erie Telecomms.*, 853 F.2d at 1096 (emphasis added). This requires an inquiry into what Ms. Overbey understood at the time she signed the settlement agreement.

In her declaration submitted to the district court, Ms. Overbey said:

> While it's true I signed the Settlement Agreement, it's categorically not true that I understood at the time the full scope of what the City is *now* saying I was and was not allowed to say, and to whom, under the gag order.

JA 233. Furthermore, Ms. Overbey was not advised that the non-disparagement clause applied as broadly as the City now explains it:

> My lawyer in that earlier case encouraged me to sign the Settlement Agreement. My lawyer explained that the gag order applied to both me and the City of Baltimore. He also explained to

me that it prohibited me from talking to the news media, which I understood to mean reporters who worked directly for television, radio, newspaper, and internet media outlets. He did not explain to me that it prohibited me from talking to anyone, and I did not understand it to mean that when I read it.

JA 233.

The district court dismissed Ms. Overbey's declaration out of hand, commenting that there is "no allegation of fraud or inequitable conduct" by the City, and insisting that because Ms. Overbey was represented by counsel, she "had every opportunity to investigate the scope of the provision" before signing the settlement agreement. JA 363. The court's logic was presumptuous. Representation by counsel may be probative of whether a litigant knowingly waived her constitutional rights, but it is not dispositive, particularly where countervailing evidence exists that neither the litigant nor her attorney understood the scope of the purported waiver. *See D.H. Overmyer*, 405 U.S. at 185–87 (noting that a waiver may not be voluntary where the waiving party contends "that it or its counsel was not aware of the significance of the challenged provision" (cleaned up)); *Atl. Leasing & Fin., Inc. v. IPM*

*Tech., Inc.*, 885 F.2d 188, 192 (4th Cir. 1989) (noting that the waiving party did not lack access to "*competent* legal counsel") (emphasis added).

The City's actions underscore the validity of Ms. Overbey's understanding. In 2015, and at least in part spurred by the media outcry to Ms. Overbey's treatment, the City amended its standard non-disparagement language. In that amendment, the City specifically clarified that the prohibition on talking publicly about one's settled case was not limited to conversations with the "news media" (as the provision read in Ms. Overbey's agreement) and extended to a much broader universe of comments, including "posting" on blogs. *See* Puente, Mark, "Baltimore clarifies clause in police settlements," *The Baltimore Sun* (Oct. 10, 2015), *available at* http://www.baltimoresun.com/news/maryland/sun-investigates/bs-md-sun-investigates-settlement-clause-20151010-story.html. If the provision was so clear to include commenting on internet websites in response to *ad hominem* attacks from strangers, there would have been no need for the City to expand the language to "clarify" that Ms. Overbey's actions fell within its scope.

### b. The Non-Disparagement Clause Was a Product of Unequal Bargaining Power.

The district court also dismissed out of hand the notion that Ms. Overbey and the City came to the settlement table with unequal bargaining power. Again, the linchpin to the court's decision-making was the fact that Ms. Overbey was represented by counsel. *See* JA 351, 361, 364. The district court further reasoned that the settlement agreement was voluntary because it was not a contract of adhesion.

Courts do not enforce waivers of constitutional rights that are entered into involuntarily. *See Lake James*, 149 F.3d at 280. Contrary to the district court's conclusion, whether a contract is one of adhesion is not dispositive of voluntariness.

A waiver is not voluntary if the contract of which it was a part was one of adhesion *or* a result of unequal bargaining power. *See D.H. Overmyer*, 405 U.S. at 186. This Circuit acknowledges that unequal bargaining power in negotiating a contract can render a waiver of constitutional rights unenforceable. *See Erie Telecomms., Inc.*, 853 F.2d at 1096 (a contract is voluntary if "the parties to the contract have bargaining equality and have negotiated the terms of the contract"); *Manning v. Mercatani*, 898 F. Supp. 2d 850, 863 (D. Md. 2012)

("[W]aivers may be suspect when there is a great disparity in bargaining power between the parties." (internal quotation marks omitted)); *accord Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686, 707 (6th Cir. 1981) ("[A] waiver would probably not be valid if a contract of adhesion or unequal bargaining power was involved.").

Courts look to the totality of the circumstances in evaluating voluntariness of a waiver of constitutional or statutory rights; this is not resolved by a simple examination of whether the contract is one of adhesion. *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (waiver of right against self-incrimination); *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 274 (1st Cir. 2002) (waiver of federal statutory rights); *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) (waiver of 4th amendment rights). The record evidence, particularly when viewed in the proper context, indicates that the one-sided non-disparagement clause here was a product of unequal bargaining power.

Ms. Overbey was homeless and destitute at the time she signed the settlement agreement. Faced with the prospects of continuing her civil rights litigation — the underlying facts of which led directly to her

homelessness and inability to secure full-time employment — she did not stand in a bargaining position equal to that of the City. The district court did not consider Ms. Overbey's poverty, or the fact that her grave circumstances were exacerbated by the City's own conduct, to be probative of her unequal bargaining power. JA 364-65. The district court's analysis was insensitive to the reasonable possibility that the destitute (even if represented) do not come to the settlement table with the same incentives that motivate individuals of greater means, a point made by counsel at oral argument. *See* JA 300-01. And that is part of the problem: the City can get away with non-disparagement clauses in 95 percent of its settlement agreements because of the direct correlation between police brutality and one's status as being poor and Black.[6]

---

[6] *See* Smith and Holmes, *Community Accountability, Minority Threat, and Police Brutality: An Examination of Civil Rights Criminal Complaints,* 41 Crim. 1035, 1042 (2003) ("[M]ore methodologically sophisticated recent studies support a link between race and the incidence of excessive force."); Correll, Wittenbrink, Park, Judd, Sadler, and Keesee, *Across the Thin Blue Line: Police Officers and Racial Bias in the Decision to Shoot*, 92 J. of Personality and Social Psychology No. 6 at 1006 (2007) ("Investigators have consistently found evidence that police use greater force, including lethal force, with minority suspects than with White suspects (e.g., Inn, Wheeler, & Sparling, 1977; Smith, 2004; see Geller, 1982, for a review). Data from the Department of Justice (2001), itself, indicate that Black suspects are approximately (Continued…)

The terms of the non-disparagement clause, as interpreted by the City, exemplify the unequal bargaining power between the City and Ms. Overbey. While the settlement agreement aimed to silence Ms. Overbey, it imposed, apparently, no such limitation on the City. *Cf. D.H. Overmyer*, 405 U.S. at 186 (an agreement is involuntary if it a product "of unequal bargaining power or overreaching"). Indeed, this disparity turned out to be central to the hot water in which Ms. Overbey later found herself. The lack of any mutual restriction on the City allowed the City Solicitor to disparage Ms. Overbey in public comments about the settlement, which prompted Ms. Overbey to defend herself online. Worse, whereas the City suffered no penalty for speaking publicly about Ms. Overbey's conduct, Ms. Overbey's comments in response triggered liquidated damages of 50% of her settlement, an arbitrary figure that bears no rational relationship to whatever *de minimis* harm the City experienced as a result of her comments. No rational party on equal footing with the City would have agreed to those terms.

---

five times more likely than White suspects, per capita, to die at the hands of a police officer.").

Notwithstanding the district court's error on the test for involuntariness, genuine and material factual disputes remain regarding issues the parties have yet to explore through discovery. The district court's conclusion that the settlement agreement, and non-disparagement clause in particular, was not a contract of adhesion is based on the faulty premise that "there was ample opportunity for Overbey to negotiate its terms." JA 364. No undisputed facts support this view, and both direct and circumstantial evidence suggest the provision was neither negotiated nor negotiable as it concerned Ms. Overbey. The court's grant of summary judgment prior to fact discovery prevents proper determination of this critical issue. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1272 (3d Cir. 1994) ("[W]aiver is usually a question of fact.").

Nor is it the answer that Ms. Overbey was represented by counsel. Even with counsel, she did not understand that negotiation over the provision was even a possibility. *See* JA 208.[7] Statements by the City's former solicitor, George Nilson, support her understanding. According

---

[7] "[My lawyer] did not try to take the gag order out of the Settlement Agreement in our negotiations with the City, and I didn't even know whether that was an option."

to Mr. Nilson, the City of Baltimore included the same non-disparagement and gag provisions in roughly 95 percent of its settlement agreements with victims of police brutality between 2009 and the time the complaint was filed in this case, during which time it paid more than $33.4 million to settling plaintiffs. JA 014.

The district court's analysis is also flawed insofar as it suggests that the settlement agreement was not a contract of adhesion simply because Ms. Overbey could have elected to reject settlement and go to trial. If that were the case, no settlement offer could ever be a contract of adhesion: every party to a dispute has the option to go to trial.

Factual questions remain as to whether Ms. Overbey entered the settlement agreement knowingly and voluntarily to the extent of the First Amendment waiver pressed by the City.

### 2. The Non-Disparagement Clause Does Not Further A Legitimate Government Interest That Outweighs Public Interest In Free Speech On Matters Of Public Importance.

Even if the Court agrees with the district court that Ms. Overbey waived her First Amendment rights knowingly and voluntarily, the City's non-disparagement clause must still be stricken because it fails to serve a legitimate government interest that outweighs those rights.

*See Grossmont*, 930 F.2d at 1399–1400 (rejecting on public policy grounds a provision of settlement agreement preventing settling party from running for elected office despite the settling party's knowing waiver of that right). As noted above, the bases proffered by the City for the non-disparagement clause were (1) to avoid disparagement and (2) to obtain case closure. The first basis is *never* legitimate and there is no nexus between the second objective and the non-disparagement clause. Closure is obtained through the agreement of the plaintiff to end the litigation; the imposition of a prior restraint adds nothing to that objective.

Below, the City tried to diminish the significance of the non-disparagement clause, emphasizing that Ms. Overbey had been free up to the point of settlement to speak about her encounter with police and, even after the agreement, "was not precluded from speaking out regarding any *other* instances of purported police misconduct." JA 126 (emphasis added). This argument fails basic First Amendment logic. Government cannot justify suppressing *some* constitutionally protected speech on the basis that it does not suppress *all* constitutionally protected speech.

> To prohibit this much speech is a significant
> restriction of communication between speakers
> and willing adult listeners, communication which
> enjoys First Amendment protection. It is of no
> moment that the statute does not impose a
> complete prohibition. The distinction between
> laws burdening and laws banning speech is but a
> matter of degree. The Government's content-
> based burdens must satisfy the same rigorous
> scrutiny as its content-based bans.

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

Government does not have the luxury of avoiding "trial in the court of public opinion," as the City urged in the court below as a basis to uphold the non-disparagement policy. Whether Ms. Overbey was free to speak freely up to the point of settlement is irrelevant to both her right to speak prospectively and the media's right to report on the case as a matter of public interest. Government's remedy for perceived disparagement is to issue its own press release or the like. It may not suppress the speech of the abused or curtail the ability of the press to investigate the news by going to the key source.

Unlike private parties, government cannot suppress speech absent compelling justification for doing so. Even then, waivers are enforceable only where the benefits of suppression outweigh its detriments. *See Lake James*, 149 F.3d at 281; *Grossmont*, 930 F.2d at 1396. The City

has not provided any legitimate justification for the non-disparagement clause. The purported benefits of the non-disparagement clause — "reducing time and resources spent on litigation in courts and fostering confidence in negotiating future settlement agreements" (JA 362) — are illusory and not a function of the non-disparagement clause. Other city and state governments across this nation reduce time and resources spent on litigation *without* demanding citizens' silence. There is no indication those settlements suffer from any less integrity than the City seeks. Instead, the non-disparagement clause's true aim is to curtail public awareness and discussion about the City's malfeasance. Because this is not a legitimate government interest, the non-disparagement clause should be stricken.

The pretextual nature of the City's purported interests is evident when considered against the backdrop of the 2016 DOJ Report. That report illuminated a grim reality within the Baltimore Police Department: a lack of accountability and transparency that facilitates, and thus fails to correct, pervasive constitutional violations; use of excessive force; and retaliation against citizens seeking to exercise their First Amendment rights. The City's non-disparagement policy

exacerbates the lack of transparency and accountability, and prevents the City's residents, many of whom live in economic circumstances that make lengthy civil litigation impracticable, from engaging in an "open, dynamic, rational discourse" about the police department's behavior. *United States v. Alvarez*, 567 U.S. 709, 728 (2012).

The public has a "strong public interest" in the effective provision of police services and the assurance that such services are not administered in a racially discriminatory manner. *See Lake James*, 149 F.3d at 281 (holding that the efficient provision of public services is a "strong public interest"); *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) (public discourse regarding racial discrimination in policing is a matter of public concern). The City's non-disparagement policy attempts to supplant those civic interests with an institutional interest in avoiding embarrassment and scrutiny. The policy undermines the accountability of the police department and other City officials and inhibits public discourse regarding police brutality.

As summarized in the Background section, the DOJ Report describes in detail how a lack of public accountability undermines the mission of the BPD (and police departments in general) and harms

minority communities. The DOJ Report details a direct and causal connection between the Baltimore Police Department's pervasive misconduct and the lack of public accountability and transparency. It notes: "BPD's accountability system is shielded almost entirely from public view, and the civilian oversight mechanisms that are currently in place are inadequate and ineffective.  These flaws damage the Department's legitimacy in the community." DOJ Report at 147. Furthermore, it concluded that:

> [The] BPD lacks meaningful accountability systems to deter misconduct. The Department does not consistently classify, investigate, adjudicate, and document complaints of misconduct according to its own policies and accepted law enforcement standards. Instead, we found that BPD personnel discourage complaints from being filed, misclassify complaints to minimize their apparent severity, and conduct little or no investigation. As a result, a resistance to accountability persists throughout much of BPD, and many officers are reluctant to report misconduct for fear that doing so is fruitless and may provoke retaliation. The Department also lacks adequate civilian oversight—its Civilian Review Board is hampered by inadequate resources, and the agency's internal affairs and disciplinary process lacks transparency.

*Id.* at 10.

The City's use of non-disparagement clauses is part of this larger pattern of suppressing criticism. The practice compounds the harm

created by the City's systemic lack of accountability, making the internal policies of discouraging complaints the official policy for resolving civil rights litigation. While the DOJ Report did not specifically identify the non-disparagement policy as a source of the City's accountability problem, the policy typifies the types of roadblocks the City uses to undermine police department accountability.

The City has not and cannot point to any legitimate interest in demanding and enforcing the non-disparagement clause. There may be, in certain situations, legitimate reasons for government to seek contractual limits on an individual's First Amendment rights. Interests of national security may fall into that category. *See Snepp v. United States*, 444 U.S. 507, 509 & n.3 (1980) (recognizing that the federal government "has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service"); *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972), *cert denied* 93 S. Ct. 553 (distinguishing the agency's legitimate interest in protecting "secret information touching upon the national defense and the conduct of foreign affairs" from other types of

information the disclosure of which the agency had no right to limit). The City of Baltimore's institutional desire to protect itself and its police department from criticism comes nowhere close to being legitimate. *See Marchetti*, 466 F.2d at 1315 (noting "the First Amendment protects criticism of the government"); *Sullivan*, 376 U.S. at 276 (observing that the Sedition Act, "because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment").

The Ninth Circuit's decision in *Grossmont* nicely illustrates the point. There an aggrieved schoolteacher (Davies), agreed to drop his lawsuit against his employer school district. The court-approved settlement agreement provided Davies an amount of money in exchange for, among other things, his agreement not to seek future employment or office in that school district. When Davies ran for and won a seat on the school board, the school district complained and obtained from the court a finding of contempt and order that Davies resign and pay the district's attorney fees. *Grossmont*, 930 F.2d at 1392–93. The Ninth Circuit reversed. Despite finding that Davies knowingly waived his right to run for future office in the school district on account of his being

(i) "highly educated" and (ii) represented by counsel, the court found that the school district's general interest in settlement could not overcome Davies' substantial interest in his constitutional right to run for elected office and the constitutional right of the voters to elect him. *Id.* at 1398–99.

Here, the non-disparagement clause does not further the City's interest in closure and the conservation of public resources otherwise spent on litigation. The City's generalized interest in settlement is no more sufficient to justify Ms. Overbey's waiver of her constitutional rights than it was in *Grossmont*. Neither the City nor the district court identified any bona fide public interest served by the non-disparagement clause specifically, and the City's general interest in closure is far outweighed by the undeniable (and conceded) public interests in transparency, disclosure, and open discussion of police misconduct.[8]

---

[8] The public harm flowing from the non-disparagement policy extends even beyond City limits. In 2012, a former Baltimore City police officer resigned his position with BPD after accusations of sexual assault. One year later, the City paid $24,000 to settle a lawsuit based on the same accusations. The settlement included a non-disparagement provision. (Continued…)

**D.    The District Court Erred by Dismissing This Case Before the Parties had the Opportunity to Conduct Discovery.**

Whether Ms. Overbey was fully informed about the scope of the alleged waiver of her First Amendment rights is a question of fact. Fundamental disagreements on genuine issues of material fact exist here, including disputes about what Ms. Overbey understood, whether the non-disparagement clause and its terms were actually negotiated, and whether Ms. Overbey, through her attorney, negotiated any part of the agreement. The district court erred in focusing on merely the four corners of the agreement and the fact that Ms. Overbey was represented by counsel. If those were dispositive, then the standard articulated in *Lake James* would be meaningless. Indeed, it is impossible to square the finding below (based solely on the four corners

---

One month after settlement, the officer was hired as the police chief for Provo, Utah — a position from which he resigned last year after several women accused him of sexual assault. Provo's mayor, who was unaware of the incident despite conducting a background check in 2013, considers the Baltimore-related allegations a "deal breaker" that would have prevented his hiring (and thus the Utah incidents). *See* Miller, Jessica and Ramseth, Luke, "A month before he led Provo police, Baltimore paid $24K to settle a sex assault case against John King," THE SALT LAKE TRIBUNE (August 1, 2017), *available at* https://www.sltrib.com/news/2017/08/01/sex-assault-allegations-against-provos-former-police-chief-not-the-first/ (last accessed May 17, 2018).

of the settlement agreement) with the burden on government to demonstrate as much by clear and convincing evidence, especially when Ms. Overbey submitted an unrebutted declaration that she did not knowingly waive her rights to the extent the district court ruled.

Where, as in this case, a well-pleaded complaint supported by a sworn declaration creates genuine issues of material fact, the plaintiff should receive the benefit of all reasonable inferences, just as the rules of civil procedure have long afforded her. By that traditional standard, the lower court abused its discretion by dismissing this case without first affording Ms. Overbey an opportunity to conduct discovery. *See Harrods Ltd.*, 302 F.3d at 244.

## II.   THE DISTRICT COURT ERRED IN HOLDING THAT THE BALTIMORE BREW DOES NOT HAVE STANDING TO CHALLENGE THE GAG ORDER.

### A.   Standard of Review

"To establish standing, a plaintiff must show: (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). To establish injury in fact, a plaintiff must "adduce

facts demonstrating that [it has] suffered an invasion of a legally protected interest," *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005) (internal quotation marks omitted), that is "concrete, particularized" and "actual or imminent," rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). A district court's dismissal for lack of standing is reviewed de novo. *Id.* at 459.

## B.   As A Media Outlet, the Baltimore Brew Has Standing to Challenge the City's Actions Stifling the Flow of Newsworthy Information.

It is axiomatic that news organizations have standing to challenge state action that burdens newsgathering efforts. There is no dispute from the City that 95 percent of its civil rights settlements gag plaintiffs from talking to the Brew (and other news organizations) about the settled case. The City's actions burden the Brew's ability to gather facts related to police misconduct from the most relevant sources.

The district court erred in improperly conflating the threshold standing inquiry with an analysis of the merits of the Brew's claims, and thus looking to the likelihood of success on the merits to determine standing. The "ultimate aim" of the standing inquiry "is to determine

whether plaintiff has a sufficiently 'personal stake' in the lawsuit to justify the invocation of federal court jurisdiction." *White Tail Park*, 413 F.3d at 460-61 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)). This Court has explained that looking to the merits when assessing standing — as the district court did here — puts the cart before the horse: "If a plaintiff's legally protected interest hinged on whether a given claim could succeed on the merits, then 'every unsuccessful plaintiff will have lacked standing in the first place.'" *Id.* at 460-61 (quoting *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997)); *see also Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009).

The relevant consideration is not, as the district court suggested, whether the Brew "ha[s] a First Amendment right to access information that the parties to the settlement agreement promised by contract to keep from the general public." Prohibiting settling plaintiffs from speaking prevents the Brew — and thus its public readership — from receiving critical information about the actions of the Baltimore Police Department. It is the very existence of the non-disparagement policy

that injures the Brew and gives it standing to sue under the First
Amendment.

### 1. The Brew Suffered Redressible Injury-In-Fact From the City's Policy of Restricting Access to Information.

It is well established that news organizations have standing to
challenge gag orders even where they are not parties to the underlying
action, but are nevertheless aggrieved because their newsgathering
rights are burdened. *See CBS v. Young*, 522 F.2d 234 (6th Cir. 1975).
The district court erred in requiring the Brew to show that it has been
effectively cut off from any access to information about the underlying
dispute. To the contrary, a restriction on protected speech violates the
First Amendment even if does not completely, or even significantly,
curtail the message. *See Citizens United v. FEC,* 558 U.S. 310, 356
(2010) ("When Government seeks to use its full power . . . to command
where a person may get his or her information or what distrusted
source he or she may not hear, it uses censorship to control thought.
This is unlawful.").

Contrary to the district court's conclusion, the aggregate effect of
the City's settlement agreements with similar non-disparagement

clauses does constitute a "concrete and particularized" injury-in-fact to the Brew. The complaint identifies the limitation on the Brew's First Amendment right to access victims of police brutality who have settled with the City. This harm is neither illusory nor speculative, is directly traceable to the non-disparagement clause challenged in this case, and can be redressed by the relief sought. As stated in the Complaint, "[o]n several occasions, Baltimore Brew attempted to contact plaintiffs directly to obtain more details about the lawsuit. Despite promises of confidentiality and anonymity, plaintiffs rarely agreed to comment on the incident or settlement, because of the gag order and the severe penalty that accompanied a breach of the gag order's restrictions." JA 032. No authority requires that establishing legal injury-in-fact requires the Brew to identify these individuals by name.

Whether, as the district court suggested, the Brew or other media had access to Ms. Overbey or other information prior to settlement misses the mark. The timing of such access is not dispositive of the Brew's standing. This Court and its sister circuits have concluded, time and again, that the media, as a news gatherer, has standing to challenge any gag or other order which interferes with or affects the

constitutionally guaranteed right as a member of the press to gather news, without finding or even considering whether the press could have obtained the restricted information at an earlier point in time. *See Cent. S.C. Chapter, Soc. of Prof'l Journalists, Sigma Delta Chi. v. Martin*, 556 F.2d 706, 707-08 (4th Cir. 1977), *cert. denied*, 434 U.S. 1022 (1978) (holding that news reporters had standing to challenge order establishing certain restrictions upon extrajudicial statements and actions of participants in a pending trial because such restrictions caused "difficulties in seeking to perform their reportorial functions"); *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1235 (10th Cir. 1986) (journal had standing to challenge gag order that "impeded its ability to gather news"); *Radio & Television News Ass'n v. U.S. Dist. Court for Cent. Dist. of Ca.*, 781 F.2d 1443, 1445 (9th Cir. 1986) (news association had standing to challenge order that "impair[ed] the media's ability to gather news by effectively denying the media access" to information); *United States v. Gurney*, 558 F.2d 1202, 1206 (5th Cir. 1977), *cert. denied, sub nom.*, 435 U.S. 968 (1978) (newspapers had standing to challenge order because they "arguably suffered an injury with respect to newsgathering").

## 2. The District Court Erred In Finding No First Amendment Implications.

In denying the Brew standing, the district court adopted the City's argument that the Brew was not entitled to the information sought because it does not have the right to "disregard" the promise settling parties made to keep from the news media facts and details concerning the events giving rise to their settled civil rights lawsuits. Relying on *Cohen v. Crowles Media Co.,* 501 U.S. 663 (1991), the district court found that "[b]ecause Baltimore Brew was not entitled to the information at issue in the first place, it would not suffer a legally cognizable injury if Overbey agreed not to provide the information."[9] This reliance is misplaced, as *Cohen* did not involve state suppression of speech.

*Cohen* addressed the potential of First Amendment implications where the state action was only the enforcement of a contract between

---

[9] The district court also generally misunderstood the Brews' grievance. As the complaint makes clear and as counsel stated at argument, the Brews' complaint does not relate to Ms. Overbey's experience specifically, but with the City's pattern and practice of demanding and securing non-disparagement clauses in nearly all settlements for cases involving police misconduct. The Brew could have filed its own, stand-alone action. JA 275.

two *private* parties. In *Cohen*, the plaintiff offered to provide two newspapers with information about a candidate in an upcoming election, only if he was given a promise of confidentiality. Despite their promise, the newspapers published the plaintiff's name as a source, causing the plaintiff to lose his job. In finding the publishers subject to promissory estoppel liability and damages, the Supreme Court explained that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on [the press's] ability to gather and report news," and that the "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." *Id.* at 669.

*Cohen* is inapposite here. The gag policy of the City directly and intentionally interferes with the Brew's ability to obtain facts about underlying lawsuits that stem from myriad incidents of police brutality. As was true of the judicial gag order challenged in *CBS v. Young*, *inter alia*, the Brew has standing to challenge the City's non-disparagement clause.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court vacate the district court's order and remand. This Court should hold (1) that the City's non-disparagement policy is unconstitutional on its face or, alternatively, as applied in this particular case, and (2) that the Brew has standing to challenge the City's policy, and remand the matter for a determination of damages and other appropriate relief or, if necessary, discovery on Appellants' claims.

Dated:  May 21, 2018            Respectfully submitted,

                                   /s/     Daniel Wolff

                                 Daniel W. Wolff
                                 Charles D. Austin
                                 Nkechi Kanu
                                 Tyler O'Connor
                                 CROWELL & MORING LLP
                                 1001 Pennsylvania Avenue, N.W.
                                 Washington, D.C.  20004
                                 Telephone: (202) 624-2500
                                 Facsimile:   (202) 628-5116
                                 dwolff@crowell.com

                                 *Counsel for Appellants Ashley Amaris Overbey; Baltimore Brew*

## ORAL ARGUMENT STATEMENT

Given the importance of the legal issues raised, Appellants submit

that oral argument is necessary and will be beneficial to the Court.

<u>/s/ Daniel W. Wolff</u>
Daniel W. Wolff

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,324 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Times New Roman.

<u>/s/ Daniel W. Wolff</u>
Daniel W. Wolff

# CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2018, an electronic copy of the foregoing brief was filed with the Clerk for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished upon the following counsel via the CM/ECF system.

Jason Robert Foltin
Assistant Solicitor
Baltimore City Law Department
100 North Holliday Street
Baltimore, MD 21202
Jason.foltin@baltimorecity.gov

Lydie Essama Glynn
Assistant Solicitor
Baltimore City Law Department
100 North Holliday Street
Baltimore, MD 21202
Lydie.glynn@baltimorecity.gov

Frederic Nelson Smalkin, Jr.
Assistant Solicitor
Baltimore City Law Department
100 North Holliday Street
Baltimore, MD 21202
Fred.smalkin@baltimorecity.gov

Colin Patrick Glynn
Baltimore City Law Department
100 North Holliday Street
Baltimore, MD 21202
Colin.glynn@baltimorepolice.org

/s/ Daniel W. Wolff
Daniel W. Wolff